WESTINGHOUSE MACH. CO. et al. v. GENERAL ELECTRIC CO. et al.

(District Court, N. D. New York. September, 30, 1912.)

1. PATENTS (§ 90*)—PERSONS ENTITLED TO PATENT—PRIOR USE IN FOREIGN COUNTRY—"KNOWN."

Defendant, a citizen of the United States, conceived an invention, but did not reduce it to practice until some four or five years later, when he applied for and obtained a patent therefor. In the meantime complainant had made the same invention, and reduced it to actual practice and use in a foreign country, but did not patent it, nor was it described in any printed publication. He made a full disclosure of the invention orally to an American, who also saw the device in actual use, and on his return to this country described it, both orally and in writing, to others skilled in the art, who were capable of understanding it, but it was not put into actual use in this country. After defendant's patent had been granted, complainant filed an application for a patent. *Held*, that the knowledge of the invention by persons in this country, obtained from complainant, in the absence of an actual reduction to practice here, did not make it "known," within the meaning of Rev. St. § 4886 (U. S. Comp. St. 1901, p. 3382), which authorizes the granting of a patent to an inventor for an invention "not known or used by others in this country before his invention or discovery thereof," and that, as between com-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plainant and defendant, neither having reduced it to actual practice in this country, defendant, who was the first to conceive it and to constructively reduce it to practice by the filing of his application, under said section and section 4923 (U. S. Comp. St. 1901, p. 3396), took precedence as the original and first inventor, and was entitled to the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 113–120; Dec. Dig. § 90.*

For other definitions, see Words and Phrases, vol. 5, p. 3943.]

2. PATENTS (§ 29*)—"INVENTION"—CONCEPTION.

A conception of the mind is not sufficient as an "invention," or a completed "invention," within section 4886, Rev. St. (U. S. Comp. St. 1901, p. 3382), requiring that, to be entitled to a patent, the person must have "invented" or "discovered" some new, etc., thing.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 29.*

For other definitions, see Words and Phrases, vol. 4, pp. 3749–3754.]

In Equity. Suit by the Westinghouse Machine Company and Coloman De Kando against the General Electric Company and Albert H. Armstrong. Decree for defendants.

Suit in equity under the provisions of section 4915 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 3392) for an adjudication and decree that said Coloman De Kando is entitled to receive a patent for his invention as specified in his claim, or for some part thereof as the facts in the case may appear; said De Kando having been denied a patent by the Patent Office and the Supreme Court of the District of Columbia, now Court of Appeals of the District of Columbia, and a patent for the invention claimed by De Kando having been granted to the defendant Albert H. Armstrong.

Gifford & Bull and J. Edgar Bull, all of New York City, for complainants.

Albert G. Davis, of Schenectady, N. Y., Charles Neave, of New York City, and Arthur A. Buck, of Schenectady, N. Y., for defendants.

RAY, District Judge (after stating the facts as above). The complainant, Coloman De Kando, is a foreigner, and at the time he made his invention was an engineer in the employ of Ganz & Co., of Budapest, Hungary. The other complainant, the Westinghouse Machine Company, is the assignee of said De Kando.

June 28, 1905, the defendant Albert H. Armstrong filed his application for a patent for his alleged invention; the claims involved here reading as follows:

"1. In combination with a vehicle, a plurality of induction motors mechanically connected to the driving wheels of said vehicle, means under the control of the motorman for controlling said motors simultaneously, and means for adjusting the relative torques of said motors.

"2. In combination with a vehicle, a plurality of induction motors mechanically connected to the driving wheels of said vehicle, means under the control of the motorman for controlling said motors simultaneously, and means for adjusting independently the relative resistances of the secondary circuits of said motors.

"3. In combination with a vehicle, a plurality of induction motors mechanically connected to the driving wheels of said vehicle, a controlling switch adapted to vary simultaneously the resistances in the secondary circuits of said motors to control the speed of the vehicle, and means for adjusting independently the relative resistances in the secondary circuits of said motors to vary the relative speed torque characteristics of said motors. .

"4. In combination with a vehicle, a plurality of induction motors mechanically connected to the driving wheels of said vehicle, a switch under the control of the motorman for controlling said motors simultaneously, and independent adjustable resistances placed near the several motors and connected in their secondary circuits."

A patent on this application was granted to said Armstrong on the 6th day of February, 1906, No. 811,758. July 3, 1906, said De Kando filed his application for the same invention, and an interference was declared in the Patent Office, which is entitled De Kando v. Armstrong, Interference No. 27,264. The various tribunals in the Patent Office decided adversely to De Kando, and the case was taken to the Court of Appeals of the District of Columbia, where the Patent Office was finally affirmed May 24, 1911. See 169 O. G. 1185. The case was submitted to the court prior to April 26, 1911, but on that day such submission was set aside and a reargument ordered on the following propositions, as stated in the order of the court directing such reargument, viz.:

"Assuming that the dates given Armstrong by the Commissioner of Patents are correct, and assuming that Waterman, upon his return to this country, possessed sufficient knowledge of the invention in issue to reduce it to practice, and disclose this information to others skilled in the art and competent to understand it and reduce it to practice, would such knowledge and disclosure amount to a reduction to practice here of the invention in use abroad? Indulging these assumptions, can such knowledge and disclosure in any manner short of reduction to practice constitute an anticipation of Armstrong's invention as would bar his right to a patent?"

The section of the Revised Statutes (section 4915 [U. S. Comp. St. 1901, p. 3392]) under which this suit is brought reads as follows:

"Whenever a patent on application is refused, either by the Commissioner of Patents or by the Supreme Court of the District of Columbia, upon appeal from the Commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the Commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication, and otherwise complying with the requirements of law. In all cases, where there is no opposing party, a copy of the bill shall be served on the Commissioner; and all the expenses of the proceeding shall be paid by the applicant, whether the final decision is in his favor or not."

The contention seems to be over the proper construction, meaning, and effect of sections 4886 and 4923 of the Revised Statutes of the United States (U. S. Comp. St. 1901, pp. 3382, 3396). Those sections read as follows:

"Sec. 4886. Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than two years prior to his application, and not in public use or on sale in this country for more than two years prior to his application, unless the same is proved to have been abandoned, may,

upon payment of the fees required by law, and other due proceeding had, obtain a patent therefor."

"Sec. 4923. Whenever it appears that a patentee, at the time of making his application for a patent, believed himself to be the original and first inventor or discoverer of the thing patented, the same shall not be held to be void on account of the invention or discovery, or any part thereof, having been known or used in a foreign country, before his invention or discovery thereof, if it had not been patented or described in a printed publication."

By section 4886 it is expressly provided, as applied to this case, that *any person* (Armstrong), who has invented or discovered any new and useful art, machine, manufacture or composition of matter, or any new or useful improvement thereof,

*"not known* or used by others [say Waterman and Leve] in this country [the United States], before his [Armstrong's] invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country [of which patenting and description in a printed publication there is no pretense, in this case], before his [Armstrong's] invention or discovery thereof, or more than two years prior to his [Armstrong's] application, and not in public use or on sale in this country for more than two years prior to his [Armstrong's] application [of which sale and use there is no claim], unless the same is proved to have been abandoned [of which there is no pretense], may, upon payment of the fees required by law, and other due proceeding had, obtain a patent therefor."

There is some evidence that the invention covered by the claims quoted was "known" by others in the United States before Armstrong's "invention or discovery thereof." If Armstrong invented the device mentioned in the claims quoted, he was, under the terms of this section, entitled to his patent, unless it (the invention) was "known" to others in the United States before he (Armstrong) made his invention or his discovery of his invention. By section 4923, as applied to this case, Armstrong was entitled to his patent for the said invention, if it was not known to others in the United States as above stated, and if at the time he made his application he believed himself to be the original and first inventor or discoverer of same, the thing actually patented, even if same had been invented or discovered by some other person, and was therefore known to such person, who had used same in some foreign country before the invention or discovery by Armstrong, *provided* such invention had not been patented or described in a printed publication here or abroad. So far as Armstrong's right to his patent is concerned, the actual invention of the same thing by De Kando in Europe prior to the time Armstrong made his invention or discovery, and knowledge of it there, and his (De Kando's) use of same in such foreign country prior to the time Armstrong invented or discovered same, does not affect it, provided such invention had not been *patented* anywhere, when Armstrong made his invention or discovery, or *described* in a printed publication. The statute recognizes that a person in some foreign country (as De Kando) may be at work on some inventive idea which he has conceived and is trying to reduce to an actual invention by creating means for making it effective and beneficial or useful, and that another person in this country (say Armstrong) may have the same precise idea or conception and be at work endeavoring to create means

to make it effective and useful. If the person at work in such foreign country (De Kando) is successful, and he completes his invention and makes it known or puts it into use in such foreign country, but does not take out or apply for a patent, and it is not described in some printed publication, and while matters stand thus with the person in such foreign country (De Kando), the person in the United States (Armstrong) succeeds and completes his invention, he is entitled to his patent, unless such invention made in such foreign country (by De Kando) had become known to others in the United States before the person at work in the United States (Armstrong) had actually made his invention.

It seems clear from the evidence that De Kando did complete and put in operation in Europe his invention (which is the same as Armstrong's) as early as April, 1904, although this was in dispute, and, it seems, a question of fact in the Patent Office, and De Kando did not obtain or apply for a patent, and it was not described in a printed publication. March 22, 1904, a Mr. Waterman and Mr. Leve went to Budapest, Hungary, where they met De Kando, who explained to them the details of the so-called Ganz system, which it is claimed, and the Court of Appeals, District of Columbia, find, included the invention in question, and which had been put in actual operation on the Valtellina road in Italy. Mr. Waterman and Mr. Leve went to the Valtellina road in Italy, and made a study and test of the system as there actually operated. At about this time De Kando wrote out and gave to Waterman a description of the more important details. Mr. Waterman and Mr. Leve then returned to the United States, where they arrived May 5, 1904. Between May 9 and May 12, 1904, Mr. Waterman discussed with a Mr. Stillwell the matters which he had investigated while abroad, and June 7, 1904, he made a written report to Mr. Stillwell, and which it is claimed fully disclosed the invention in question here. The pertinent part of such report reads as follows:

"D. The equal division between motors depends upon the equality of wheel diameter, and this is largely affected by a comparatively small difference of diameters. This is not a peculiarity of three-phase motors, but is true of all others. It is, however, a matter of much more serious consequence with motors operating normally at nearly a constant speed, since a variation of a few per cent. in wheel diameter, and hence in rotative speed, may either constantly rob the motor of load or give it an entirely unsafe overload. The importance of this characteristic · in any particular case depends upon the character of the services, and where the runs consist only of acceleration, coasting and braking, it may be of little consequence, since the motors are in general running on the rheostat, and the automatic control device itself adjusts the motor to its work. For locomotives having side-bar drives, where the driving wheels are of necessity kept of the same diameter, this consideration does not enter; but for those having co-axial motors, with driving wheels unconnected, or for operation by multiple unit control on long runs, it is of importance. In such cases it is necessary to provide resistances with each equipment for insertion in the secondaries of the motors, the wheel diameter must be marked upon the truck, and, in making up trains, resistance must be inserted to bring the motor having greatest driving wheels as nearly as possible to the standard of those of smallest diameter. This is an inconvenient and somewhat awkward expedient, and will not perfectly attain the end sought; but it appears practicable. The larger the driving wheel,

the less necessary this will be, since the available thickness of the tire does not increase proportionately to the diameter of the wheel."

This would seem to describe the invention in question, for which a patent was granted to Armstrong. As stated, Armstrong filed his applications for his patent June 28, 1905, but he claims that he had conceived this invention prior to that time. The statute is:

"Any person who has invented * * * not known * * * by others in this country before his invention * * * may obtain a patent therefor."

Therefore two questions are important, both questions of fact, viz.: "When did Armstrong make his invention? and, Was such invention (not the mere fact of such invention, or the fact that some other person had made the same invention elsewhere, or in some other country, but knowledge of the patentable conception or idea, and of the means to put it in use, actual knowledge that it had been done), known to others in the United States when Armstrong actually made (not conceived) his invention?

As to what constitutes "invention," Robinson on Patents, § 125, says:

"No mental operation, however definite and valuable may be its result, is a complete inventive act. That which rests in thought only, as a mere theory or intellectual conception, can never be a means producing physical effects. It is not 'a manufacture,' in any sense in which that word has been applied in the industrial arts. It is neither 'a thing made,' nor 'a manner of making.' It improves no trade, confers no public benefit, and can be subject to no protection which the law is able to afford. An invention, therefore, does not exist until the generated idea has been reduced to practice. It is not enough that, as it lies in the inventor's mind, or can be explained to others, it is possible, or even practicable. 'Its possibility must become actuality.' 'Its practicability must be demonstrated by experience.' The means which has been conceived must be made operative and useful in the arts. The spirit that has been created must be clothed with a body, by which it is brought into contact with the exterior world, and through which its energies can act upon material substance. In a word, the invention must be put into the hands of the public in a condition for immediate use, requiring no further speculation or experiment, but fitted, as it is, for the accomplishment of its intended ends."

It is evident, from the opinion of the Court of Appeals of the District of Columbia, found in the record, that the court found:

I. That De Kando actually made his invention in a foreign country, and reduced it to actual practice, and put it in actual use, prior to the spring of 1904, on the Valtellina Railway in Italy.

II. It was, therefore, an invention which could be and was seen, understood, and known to be practical. There was not only the patentable conception, but the idea of means, and means.

III. That on March, 1904, Waterman went from the United States to Europe, and met De Kando at Budapest, where the details of the invention were explained to him, and then, proceeding to Italy, Waterman saw the invention in actual use. In addition, De Kando then furnished Waterman with an elaborate written description of the invention.

IV. It appears from the evidence that Waterman was learned and skilled, and fully capable of fully understanding, and that he did understand, the invention.

V. Waterman, therefore, "knew" that the invention had been conceived, and actually made and reduced to actual and successful practice.

VI. That Waterman not only brought the information he had gained in Europe with him to the United States, when he arrived May 5, 1904, but also the said written description of such invention, and notes which he had made relating to such invention while in Europe.

VII. That Waterman made a written report as to this invention to Stillwell June 7, 1904, and during the year following he described same in the United States to a number of electrical engineers of standing, all capable of understanding same, and June 19, 1905, Waterman explained the invention to the American Institute of Electrical Engineers in the United States.

I quote from said opinion of the court:

"On June 28, 1905, appellee filed an application in the Patent Office for a patent on the invention in issue, which was granted February 6, 1906. Appellant's application was filed July 3, 1906. With the filing dates before us, we will review briefly what the respective parties did prior to entry into the Patent Office. It appears that appellant made his invention abroad, and put it into actual use, prior to the spring of 1904, on what is known as the Valtellina Railway in Italy. It appears that in March, 1904, one Waterman went to Europe, and met the appellant at Budapest, where the details of appellant's invention were explained to him. He also saw the invention in use on the Valtellina road in Italy. In addition, appellant furnished Waterman with an elaborate written description of the invention. That document, together with notes he had made, Waterman brought with him to the United States, where he arrived on May 5, 1904. Within a few days after his arrival he communicated his information in detail to one Stillwell, a distinguished electrician in New York. Waterman made a preliminary written report to Stillwell on June 7, 1904. During the following year Waterman described the invention to a number of electrical engineers, among whom was one De Muralt, now professor of electrical engineering in the University of Michigan. It also appears that Waterman explained the invention to the American Institute of Electrical Engineers on June 19, 1905."

From this it is impossible to say that the fact of this invention in its details, and as a practical, complete, invention in use in a foreign country, was not known by others in the United States as early as June 7, 1904, giving to the words "not known" their ordinary meaning. The fact of the invention and all its details were made known to others in this country, and understood. The Court of Appeals, District of Columbia, proceeds to say:

"It must be conceded that on appellee's [Armstrong's] filing date [June 28, 1905], his date of reduction to practice, appellant's [De Kando's] foreign invention was known in this country. But the date of appellee's [Armstrong's] discovery relates back to his date of conception, which was prior to Waterman's disclosure of appellant's [De Kando's] invention here."

That is, while De Kando had actually made the invention in Europe, and reduced it to actual practical use, and through Waterman had conveyed full knowledge of it in all its details to others, the pub-

lic, in the United States, so that it was in fact known to others here when Armstrong filed his application for a patent, and thereby "constructively" reduced *his* invention to practice here, Armstrong was entitled to his patent, in spite of the provisions of section 4886 to the effect that he was not entitled to a patent for the invention, if it was known by others in this country before he (Armstrong) invented same. The ground of this holding seems to be that, when Armstrong actually filed his application for a patent, it related back to the time he conceived the idea (invented it in his mind merely), and that the date of such conception is the date of "his invention or discovery thereof." The Court of Appeals, District of Columbia, then proceeded:

"It follows, then, that before the knowledge of appellant's [De Kando's] invention here can constitute a bar to appellee's [Armstrong's] right to his patent, it must operate as a reduction to practice in this country. Any knowledge or use of the invention by appellant [De Kando] abroad, in the absence of a patent or description in a printed publication prior to appellee's [Armstrong's] date of invention or discovery, cannot deprive appellee [Armstrong] of his right to a patent. R. S. § 4923."

This is equivalent to holding that, if Waterman had reduced the invention to actual use and practice in the United States before Armstrong filed his application, such reduction to practice would have barred Armstrong's right to a patent, but that full and complete knowledge of same by the public in the United States did not; that is, by virtue of section 4923, as Armstrong, at the time of making his application, believed himself to be the original and first inventor or discoverer of the thing patented, and it had not been patented or described in a printed publication anywhere, he (Armstrong) was and is entitled to his patent, inasmuch as he had conceived it before it became known to the public in the United States through Waterman, and in spite of the fact that, before he (Armstrong) even constructively reduced the invention to practice, same was well known and understood by others—that is, by the public—in the United States. Reducing this to actual practice in granting patents, it comes to this: A. has a patentable conception or idea, and also the idea of means to make it effective and useful. He does nothing more then, but carries the ideas, and ideas and means, with him undisclosed. B., in a foreign country, has the same patentable conception or idea, including means, and he then proceeds to make his invention, and reduce it to actual practice, and make it useful to the public, and does so, and also fully exhibits and discloses same in all its details to persons who understood it, and who bring the information to the United States, and make the knowledge of the entire invention public here as a completed successful thing, but do not reduce it to practice here. Thereupon A. files his application for a patent. He is granted the monopoly, despite the fact that the invention had been conceived, completed, and reduced to practice abroad by B., and full knowledge of all such facts made public here before A. filed his application for a patent.

I understand, from the subsequent parts of the opinion referred to, that it was intended to hold that full knowledge by others here in the

United States of the invention in all its details, and of the fact that De Kando had fully completed the invention in Europe and reduced it to practice in public, is of no account in this case; that such knowledge was no knowledge, unless those obtaining it here reduced it (the invention) to actual practice here; that then, and then only, is the new and useful art, machine, manufacture, or composition of matter, as the case may be, known to others in this country; that before that is done the invention is, in patent law, under the sections of the Revised Statutes quoted, "not known or used by others in this country." It seems to me somewhat inconsistent to say that Armstrong, within the meaning of the statute, had invented the thing patented when he conceived the idea, and had also a mental conception of means for making it operative and useful, although he did nothing more, but that the invention, actually conceived, made, and put in practical operation in Italy, with full knowledge and information of such facts given to the public in the United States, was not known in this country.

Mr. Armstrong places the date of his mental conception of this invention in 1894 and 1895; but he says:

"At that time (1894 and 1895) our work called for a consideration only of a single car operation, and no immediate opportunity of applying my knowledge presented itself."

From his testimony I conclude he does not claim to have put his mental conception and knowledge into practical use or operation until some time in the spring of 1905, and March 28, 1905, he disclosed it to others. In June following he filed his application for a patent. In the meantime De Kando perfected the invention in Europe, and put it in practical operation there, and in May and June, 1904, caused full information regarding it to be taken to the United States in written form, and communicated orally to, we may say, the public, and July 8, 1906, he applied for a patent here. I find nothing in the record disclosing the date of De Kando's conception of this invention. So far as the public in the United States is concerned, De Kando made the invention known to Waterman and others in writing in May and June, 1904, while Armstrong made it known in writing in March, 1905.

Coming to the authorities bearing on the question, we find much that is helpful and much that is confusing. By section 4886, R. S., any person who has *invented or discovered* any new and useful art, machine, manufacture, or composition of matter, or any new or useful improvements thereof, "not known or used by others in this country before his invention or discovery thereof," may obtain a patent therefor. But, taking section 4886 and 4923 together, it is obvious that a patent is not to be defeated or denied because the invention had been known and used in a foreign country before and down to the time of his invention or discovery thereof. But knowledge and use in a foreign country is quite distinct from full knowledge thereof in this country. From the language of section 4886, we assume that to be entitled to a patent the person must have *"invented"* or *"discovered"* some new, etc., thing. It is clear that De Kando

was entitled to a patent for this invention in the United States at any time after April 4, 1904, down to June 28, 1905, when Armstrong filed his application. He had a completed and perfected invention. Had Armstrong invented anything, in the sense of the statute quoted, prior to his written disclosure March 28, 1905, followed by the filing of his application June 28, 1905, and is it material whether he had or not? He was first to file his application for a patent, but not the first to publicly disclose the invention in this country. When De Kando fully described the invention in writing, and gave it to Waterman for public use or disclosure in the United States, and Waterman did use it and publicly disclose same in the United States, it was the same as if De Kando had done the same thing.

[2] A conception of the mind is not an invention, or a completed invention, until represented in some physical form. Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 489, 11 Sup. Ct. 846, 35 L. Ed. 521; Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821; Dashiell v. Grosvenor, 162 U. S. 425, 16 Sup. Ct. 805, 40 L. Ed. 1025. But in O'Reilly v. Morse, 15 How. 62, 109 (14 L. Ed. 601), in a contest as to priority of invention, Morse was awarded priority over Steinheil, Wheatstone, and Davy, although he had only completed the whole process, combination, powers, and machinery in his mind; his delay in bringing it out being due to his "want of means." Speaking of Morse and the date of his invention, the court said:

"The evidence is full and clear that, when he was returning from a visit to Europe in 1832, he was deeply engaged upon this subject during the voyage, and that the process and means were so far developed and arranged in his own mind that he was confident of ultimate success. It is in proof that he pursued these investigations with unremitting ardor and industry, interrupted occasionally by pecuniary embarrassments; and we think that it is established by the testimony of Prof. Gale and others that, early in the spring of 1837, Morse had invented his plan for combining two or more electric or galvanic circuits, with independent batteries, for the purpose of overcoming the diminished force of electromagnetism in long circuits, although it was not disclosed to the witness until afterwards, and that there is reasonable ground for believing that he had so far completed his invention that the whole process, combination, powers, and machinery were arranged in his mind, and that the delay in bringing it out arose from his want of means; for it required the highest order of mechanical skill to execute and adjust the nice and delicate work necessary to put the telegraph into operation, and the slightest error or defect would have been fatal to its success. He had not the means at that time to procure the services of workmen of that character, and without their aid no model could be prepared which would do justice to his invention. And it moreover required a large sum of money to procure proper materials for the work. He, however, filed his caveat on the 6th of October, 1837, and, on the 7th of April, 1838, applied for his patent, accompanying his application with a specification of his invention, and describing the process and means used to produce the effect. It is true that O'Reilly, in his answer, alleges that the plan by which he now combines two or more galvanic or electric currents, with independent batteries, was not contained in that specification, but discovered and interpolated afterwards; but there is no evidence whatever to support this charge. And we are satisfied from the testimony that the plan, as it now appears in his specification, had then been invented, and was actually intended to be described. With this evidence before us, we think it is evident that the invention of Morse was prior to that of Steinheil, Wheatstone, or Davy. The discovery of Stein-

heil, taking the time which he himself gave to the French Academy of Science cannot be understood as carrying it back beyond the months of May or June, 1837; and that of Wheatstone, as exhibited to Professor Henry and Bache, goes back only to April in that year; and there is nothing in the evidence to carry back the invention of Davy beyond the 4th of January, 1839, when his specification was filed, except a publication said to have been made in the London Mechanics' Magazine, January 20, 1838; and the invention of Morse is justly entitled to take date from early in the spring of 1837. And in the description of Davy's invention, as given in the publication of January 20, 1838, there is nothing specified which Morse could have borrowed; and we have no evidence to show that his invention ever was or could be carried into successful operation."

In Loom Co. v. Higgins, 105 U. S. 580, 592 (26 L. Ed. 1177), priority of invention was awarded to Webster, although he had only exhibited it in a drawing, and the court held:

"Of the two original inventors, the first will be entitled to letters patent, unless the other puts the invention into public use more than two years before the application for them.

"8. An invention relating to machinery may be exhibited as well in a drawing as in a model, so as to lay the foundation of a claim to priority, if sufficiently plain to enable those skilled in the art to understand it."

Apply the proposition stated that, "of the two original inventors, the first will be entitled to letters patent, unless the other puts the invention into public use more than two years before the application for them" in the United States, meaning we find here two original inventors, one foreign and the other domestic, but neither had put the invention into public use in the United States at all prior to the application for a patent by Armstrong, the domestic inventor. The foreign inventor was first to make knowledge of it public in the United States; but Armstrong was first to apply for a patent, and, so far as appears, the first to conceive the invention. It is clear that, in determining who the first inventor was as between these two, the use of the invention and actual reduction to practice in Italy cannot be considered. Section 4923, supra. It had not been patented or described in a printed publication, and it seems to be conceded that Armstrong believed himself to be the original and first inventor thereof. The actual knowledge of the invention, and the actual reduction to practice and public use of same in Italy, is only important as bearing on the question whether or not such invention was known in this country when or before Armstrong made his invention, within the meaning of section 4886.

Section 4923 does not exclude evidence of knowledge and use of the alleged invention in a foreign country on the application for a patent for that invention by one residing here and claiming to have invented it here. Section 4923 does not say or intimate that if A., a resident of this country, applies for a patent here, claiming to be the original and first inventor of the invention for which he seeks a patent, it may not be shown that A. did not invent or discover it at all, but that he saw it in full practical operation and use in a foreign country, studied it, understood it, copied it, and brought his information to this country, and here sought to patent it as his own invention and discovery. I do not understand that a mere visitor to Europe,

who there discovers or sees a new and useful machine in full opera-tion (one not patented or described in a printed publication, and never heard of in the United States), may copy and make a duplicate here, and have a patent therefor as the original and first inventor, because of the provisions of section 4923, R. S. The patent granted to a person here is not void, and is not to be denied to an original inventor here, for the reason merely the invention had been known or used in a foreign country before his invention or discovery thereof; but the inventor here is not entitled to a patent if such invention was or had become publicly known by others in this country before his invention thereof.

It would seem clear enough, from the wording of section 4886, that it was intended to deny a patent to an applicant therefor, even if it appeared such applicant had invented it here—conceived it and put it in operation—when it also appears that such new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof, *was actually known to others or used by others in this country*, before his (applicant's) invention or discovery thereof. And I do not see that the statute makes any distinction as to when, or where, or how, or by what means, such "others in this country" became possessed of their knowledge of it. We come back to the proposition: Does section 4886 mean, by the words "not known or used by others in this country before his invention or discovery thereof," that the invention had not been reduced to actual practice or use in this country, or had not been made known by the application in due form for a patent therefor? If so, why was it not so stated? Why the language used? Did the word "known" have a meaning in the patent law, or our patent statutes, implying reduction to practice? The only case in exact point, to which I am cited, or am able to find, is Doyle v. Spaulding (Circuit Court of New Jersey, 1884) 19 Fed. 744, 746. All that Judge Nixon said on the subject, aside from stating the facts, was:

"After a careful consideration of the provisions of the three sections of the patent act which bear upon the subject (sections 4886, 4920, and 4923, Rev. St.), we are of the opinion that the use, or a knowledge of the use, of an invention in a foreign country by persons residing in this country will not defeat a patent which has been here granted to a bona fide patentee, who at the time was ignorant of the existence of the invention or its use abroad."

I do not discover that this case has ever been cited or overruled in any decision or by any court. Walker on Patents, 4th edition, cites the case (Walker on Patents [4th Ed.] § 54, page 52), and says, after quoting from section 4886, R. S.:

"Prior knowledge, possessed in this country, *by some other person* than the applicant for a particular patent, that the subject of that patent was known and used in some foreign country before its invention here, is not such knowledge in this country as will negative the novelty of the patent covering that subject."

I can agree without hesitation that actual and complete knowledge of the actual thing patented, the subject of the patent, and that it had been reduced to practice and successful operation in a foreign

country by *one* person here, who understood it, and was capable of making it and putting it in practice here, would not be such knowledge in this country as would defeat the right of the domestic inventor to a patent; but the facts of this case go much further, and show a public knowledge or publication by oral statements and explanations—that is, knowledge by a great number of persons fully capable of understanding it, and from the information possessed reducing it to actual practice. To hold that this invention (or thing described and claimed in the patent to Armstrong) was "not known" in the United States long prior to the time Armstrong applied for his patent comes dangerously near "judicial legislation"; but we know that some words in our patent laws have a meaning much broader or narrower, as the case may be, than the dictionary definition. As said in Walker on Patents, pp. 51 and 52, §§ 52 and 53:

"The statutes of the United States have always provided that anything to be patentable must be *new.* * * * Many things are new in the eye of the patent statutes in addition to those things which are *really* new."

In one sense a thing like a machine is "not known" until it is actually made as an article of use—not a model—and put in operation as a practical thing, as until then it cannot be definitely and certainly known that it is operative, and therefore practical and useful, what it purports to be as an invention designed to produce a new practical and useful result. In another sense it is known when the idea is fully evolved or developed, and a machine in accordance therewith is shown by drawings in all its parts, and mechanics skilled in that art see that it must operate as claimed and that it cannot be otherwise, or a working model is made which operates as claimed, and it is a mere question of dimensions; that is, of building an enlarged or full-sized machine. Is it good reasoning to say that A. *"has invented"* a new and useful machine, etc., in the United States when he has only framed it in his mind, but that the same invention made by B. in a foreign country and fully reduced to practice there is "not known" in this country when full knowledge of it as a completed practical thing, including its operation and construction, in writing (not in a printed publication), has become public and known to those skilled in the art and capable of understanding it and reducing it to practice in this country? Can there be "invention" without knowledge of the thing invented, and if there is "invention," is not the thing invented known to the inventor, in the sense of the patent law, without any reduction to actual practice, or the filing of an application in due form describing it; and, if known to the inventor, is it not known to others to whom it has been so fully described orally and in writing by the inventor that they fully comprehend and understand it and are able to reduce it to practice?

I think there is a distinction between knowledge by others in the United States of the use of a thing or device accomplishing a certain result in a certain way in a foreign country, and knowledge by others in this country, not only of such use, but of the full particulars of such device; knowledge not only that it is and has been in actual operation in the foreign country, but full information as to

the principle on which it operates and of all the details of its construction, as well as its mode of operation and purpose, and the result attained. In 1 Robinson on Patents, § 320, page 438, Doyle v. Spaulding, supra, is cited as sustaining the proposition, stated in the text, that:

"Foreign use, at least under the provisions of our present statutes, does not communicate to the public in this country any knowledge of the invention."

In the notes he cites many cases holding this proposition, and the further proposition "that, if a person claiming a patent derived his knowledge of the invention from such prior foreign use, his claim must be denied on the ground that it is not his own invention," which is, of course, true; and therefore, when the issue is that the alleged inventor did not invent the thing patented or claimed at all, the foreign use and the claimant's knowledge of it may be shown. 1 Robinson on Patents, note, page 439, and section 324, page 445, where it is said:

"That his knowledge of the invention as in foreign use before his own invention is a bar (to a patent), see," etc.—citing cases, including Roemer v. Simons, 95 U. S. 214, 24 L. Ed. 384.

He also says:

"That knowledge in this country of use abroad is not *prior use and knowledge*. See Doyle v. Spaulding (C. C., 1884) 19 Fed. 744, 27 O. G. 300; Illingworth v. Spaulding (C. C., 1881) 9 Fed. 611."

There is no statement in the text or notes that the reduction to practice and use in a foreign country, and full knowledge of such use *and* of the machine or apparatus and mode of its operation and the principle on which it operates, and of its construction and the result obtained, when communicated orally and in writing to and understood by the public in the United States, is not such knowledge of the invention in this country as will defeat the right of the domestic inventor to a patent. There is no claim in this case that Armstrong actually derived his knowledge of this invention from outside sources, or through the information brought to this country by Waterman and made public here in the manner stated. As the record stands, De Kando conceived this invention and reduced it to actual public use and practice in Italy prior to April, 1904, and orally and in writing through Waterman made full disclosure thereof to the public in the United States in May, 1904. He did not apply for a patent. Prior to 1901 or 1902, Armstrong had conceived the same invention, and in March, 1905, for the first time, made a disclosure of it to another; but he did not reduce it to practice or make it public, and in June, 1905, he filed his application for a patent. There is no claim or pretense that Armstrong exercised reasonable diligence, or any diligence, or that he made any effort whatever to reduce his invention to practice prior to filing his application for a patent.

If the statute is construed to mean that such knowledge in this country of the invention as De Kando, through Waterman, gave the public, does not make it known in this country, it will be possible for

persons under similar circumstances in other cases to avail themselves of the information thus gained, allege themselves to be the first inventor, claim they conceived it at a date long anterior to their application, or any disclosure by them, and obtain a patent for inventions they never made, or had any conception of, except through the disclosures here of the actual inventor abroad, who allowed and sanctioned, it may be, full disclosure in this country without filing an application for a patent. It would be impossible to prove, in many cases, at least, that the person alleging himself to be the inventor did not conceive it in his mind, or that he gained his information by hearing statements and descriptions of what had been done abroad. Was it or was it not to guard against such an occurrence that the statute was worded as it is?

It is conceded that date of invention, as between two claimants for a patent for the same invention, may relate back to the date of conception, provided the claimant used due diligence to reduce his invention, his mental conception thereof, to actual practice; that is, to complete his invention. If two persons conceive an invention at the same time, each independently of the other, and both use due diligence, it would seem that the one who completes the inventive act first and files his application should have the patent. If one is lax and the other diligent, clearly the diligent one, if he complies with the law, should take precedence. If one precedes the other in mental conception, but that other is first to complete the inventive act by reducing it to actual and successful practice anywhere, and he then makes it known to the public by full disclosure in this country, so that all skilled in the art may understand and practice it, is he not entitled to his patent, as against the one who did not reduce it to practice until a later period, and then to constructive practice only by filing an application for a patent?

It may be said that in such case the one who takes precedence in mental conception, diligent or not diligent, has preceded the other in filing his application for a patent, which is true, and that, on so filing his application, his date of invention is as of the mental conception, the beginning of the inventive act; but does he not come within the prohibition of section 4886, R. S., which denies him a patent if the invention was in fact *known* (in the full manner referred to) to others in this country before his invention or discovery thereof was completed? Is constructive reduction to practice by filing an application enough to carry his date of invention back to his date of conception, as against one who conceived it at about the same time, it may be later, and actually reduced it to practice and use in public, although not in this country, and then communicated full knowledge of it, its use, its principles, construction, mode of operation, and results, to the public in this country, but not by a printed publication, before such constructive reduction to practice?

The record in this case fails to disclose that De Kando made his disclosure to Mr. Waterman and Mr. Leve, who brought the information to the United States and here gave it to the public, for the purpose of obtaining letters patent for the invention, or for the purpose

of introducing the invention into public use, although that was doubtless contemplated. For this reason, Thomas v. Reese, 1880, C. D., 12, is not in exact point. The Commissioner there said:

"If, having conceived it and reduced it to practice abroad, he communicates it to an agent in a foreign country, and sends his agent to the United States to obtain letters patent, or to introduce it to public use, he may, in an interference, fix the date of his invention on the day of his agent's arrival in the United States. If, having conceived it and reduced it to practice in a foreign country, he communicates it to an agent in the United States for the purpose of obtaining letters patent, or of introducing it to public use in the United States, he may, in an interference, carry the date of his invention back to the day on which it was fully disclosed to such agent in the United States."

Gessner v. Miller, 1890, C. D., 6, is to the same effect.

In Hanifen v. Price (C. C.) 96 Fed. 435, 441, the question was different from the one now before the court; but the language of the learned judge who gave the opinion in that case would seem to favor the contention of the complainant here to some extent.

I have serious doubt as to the soundness of the decision of the Court of Appeals of the District of Columbia in refusing a patent to De Kando; but, in view of the decision of that court and of the District Court of New Jersey, Doyle v. Spaulding, supra, and the seeming approval of that case by the learned authors of Robinson and Walker on Patents, I am constrained to hold that the patent was properly awarded to Armstrong, and not De Kando, on the grounds:

I. That, so far as appears, Armstrong was the first to conceive the patented invention, while De Kando was the first to reduce it to actual practice and use.

II. That Armstrong was first to reduce such invention to constructive practice in the United States, and that he did so by filing his application for a patent, and thereby giving to the public in this country actual and permanent information and knowledge thereof.

III. That, having done so, he was and is entitled to have the date of his invention, for the purpose of determining the question of priority of invention as between himself and De Kando, relate back to at least 1901, or 1902, the date of his conception thereof, while De Kando can only have the date of his invention, for the purpose of a patent in this country, relate back to May 9, 1904, when Waterman made it fully known to the public in this country by oral explanations and statements, and to those capable of understanding it, and who did understand it.

IV. That De Kando might then have filed his application for a patent, and gained priority, but did not, and it is not shown that he furnished the information to Waterman for the purpose of having him file an application for a patent in his (De Kando's) behalf, or for the purpose of putting the invention in actual public use in this country.

V. That as Armstrong filed his application before De Kando filed his, and as neither had reduced the invention to actual practice or use in this country, they stood on an equality, except that, so far as appears, Armstrong was the first to conceive the invention, while De Kando was first to give the invention to the public here, which he did

orally only. That, therefore, Armstrong took precedence as the first inventor.

VI. That the actual knowledge of the invention given to the public by Waterman, which was sufficient to enable man skilled in the art and who received the information from him to reduce it to actual practice and use, was not such knowledge of the invention in this country before Armstrong made his invention or discovery thereof as, in the absence of actual reduction to practice in this country by any one, barred Armstrong's right to a patent.

VII. That in the absence of actual reduction to practice in this country, and of an actual completion of the inventive act in this country by either Armstrong or De Kando, he who first reduced it to constructive practice here took precedence in his right to a patent. That the actual reduction to practice by De Kando in Italy, there being no patent and no printed publication describing it, cannot deprive Armstrong of his rights of priority.

Bill dismissed, with costs.