**V. D. ANDERSON CO.**
v.
**HELENA COTTON OIL CO. et al.**
No. H-487.

United States District Court
E. D. Arkansas, E. D.
Dec. 29, 1953.

934

House, Moses & Holmes, Little Rock, Ark., Thomas J. Doran, Cleveland, Ohio, C. Blake Townsend, New York City, for plaintiff.

Daggett & Daggett, Marianna, Ark., and Albert R. Henry, Buffalo, N. Y., for defendants.

LEMLEY, District Judge.

This cause comes on for hearing upon the plaintiff's objections to certain interrogatories propounded to it by the defendants, which objections have been submitted upon written briefs.

This is a patent infringement suit brought by the plaintiff against the Helena Cotton Oil Company, a dissolved

Arkansas corporation referred to in the pleadings as the "Old Corporation", the Helena Cotton Oil Company, Inc., an Arkansas corporation which is the successor of the first named defendant and which is referred to in the pleadings as the "New Corporation", and certain individual defendants who were officers and directors of the Old Corporation and who are officers and directors of the New Corporation. Plaintiff seeks by this action to enjoin an alleged infringement of its patented process for extracting oil from cotton seed and other seeds and nuts having a high oil content, and further seeks damages, costs, and attorneys' fees. The defendants deny that the plaintiff's patent is valid, and deny that they have infringed it, if valid; by way of counterclaim they seek an adjudication of invalidity and noninfringement together with damages, costs, and attorneys' fees.

Before taking up the defendants' interrogatories and the plaintiff's objections thereto, it is necessary to analyse in some detail the pleadings in the case and the patent in suit, a copy of which patent has been attached to the complaint as an exhibit:

The plaintiffs allege that on December 2, 1948, one Dr. John W. Dunning "being then and theretofore the true, original, first, and sole inventor of a certain new and useful invention in an Oil Extraction Process", filed an application for a patent on his process, and that after duly complying with all requirements of law he received his patent, the same being issued May 1, 1951. It is then alleged that, on or about November 4, 1948, Dunning assigned his rights in his invention to the plaintiff, and that plaintiff is now the owner of said patent.

It is next alleged that the defendants, since the issuance of the patent, have infringed upon it and are now infringing upon it, and that Helena Cotton Oil Company, Inc., will continue to infringe upon it unless enjoined. These allegations are based upon "information and belief".

It is further alleged that on May 16, 1951, plaintiff advised the "Old Corporation", which was then in existence and operating, of the alleged infringement and requested it to cease and desist from infringing; that on June 7, 1951, J. C. Brady, the manager of the Old Corporation, acknowledged receipt of the letter of warning. It is then alleged that the plaintiff has sought to work out a licensing agreement with the defendants for the use of the patented process, but that it has been unable to do so.

It is next averred that the invention in question is and has been of great utility and value, of great benefit to the public, and extensively applied to practical use in various parts of the country; that it has effected substantial improvements and economies in the art of recovering oil from oil-bearing organic materials and has met with substantial and important commercial success and recognition in the industry. It is then said that the defendants' continued infringements have greatly damaged the plaintiff, and that unless said infringements are enjoined, the damage will continue and will be irreparable, and that the defendants have received and will continue to receive profits which in equity belong to the plaintiff, and that the precise amount of the latter's damages cannot be ascertained except by an accounting.

The prayer is for an adjudication of validity and infringement, for an injunction, and for a judgment ordering the defendants "to account for and pay over to the plaintiff damages which shall be due and adequate compensation for all infringement by the said defendants, and each of them, * * * said damages to be in no event less than a reasonable royalty for the use of the inventions of said patent * * *, together with such costs, interest, and reasonable attorney's fee as may be fixed by this * * * Court, and that said damages be increased by the Court as

provided in Title 35, United States Code, Sec. 284".[1]

Before discussing the patent itself it should be noted that the traditional method of extracting oil from cottonseed has been the application of simple pressure so as to press from the seed as much oil as possible; the by-product remaining after the oil has been pressed out is known as "press cake", and it may be sold for cattle feed or other purposes as "cake", or it may be further processed and sold as cottonseed meal, which is valuable for animal feed and fertilizer. The objection to this traditional method has been that pressure alone leaves in the cake a percentage of residual oil which is too high in comparison to the value of the cake or meal; throughout the years efforts have been made in the industry to improve the efficiency of the extraction process so as to reduce the percentage of residual oil in the cake, and considerable experimentation has been done with the end in view of developing a method of efficient oil extraction by treating the seed with chemical solvents. Such a process was devised some years ago by the Allis-Chalmers Manufacturing Company, which sold one of its plants to Delta Products Company at Wilson, Arkansas, and another to Helena Cotton Oil Company, one of the defendants in the instant case; a dispute arose as to the performance capabilities of the Allis-Chalmers process and litigation developed between that company on the one hand and Delta Products Company and Helena Cotton Oil Company on the other. Said litigation culminated in a jury trial before us at Jonesboro, Arkansas, early in 1951; some of the attorneys involved in that litigation are also of counsel in the instant case. In the course of that litigation some reference was made to the process upon which the plaintiff here holds a patent; this process is, we believe, known as the "prepress-solvent extraction process", and, stated in its simplest form, it involves the subjecting of seed to pressure so as to remove a portion of the oil and then treating the "press cake" with a chemical solvent to remove as much additional oil therefrom as possible.

The patent in suit first sets forth the difficulties which have been encountered in undertaking to extract, by chemical solvents, oil from seeds and nuts, such as cotton seed, which have a high oil content, it being stated that the difficulties were twofold: first, the difficulty of the chemical reaction itself in seeds and nuts having high oil capacity; and, second, the presence of "fines"[2], which impaired the efficiency of the operation. After discussing these difficulties, the applicant, Dr. Dunning, stated:

"My invention is designed to overcome the objections to such prior practices by an improved process which takes advantage of the fact that some fractional proportions of the native protein and carbohydrates in these high oil content materials are water soluble, and that such water soluble constituents form gels under certain conditions or factors of temperature, moisture time, and accompanying oil content. By so regulating or controlling these

1. Title 35 U.S.C.A. § 284 provides that upon a finding for the claimant the Court shall award compensatory damages in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the Court; said Section further provides that the Court "may increase the damages up to three times the amount found or assessed." Title 35 U.S.C.A. § 285 provides that the Court "in exceptional cases may award reasonable attorney fees to the prevailing party."

2. As we understand it, "fines" are minute particles of matter which are formed in the course of solvent extraction of oil from seeds and nuts. The problem caused by them is stated by Dr. Dunning in his patent in the following language: " * * * Such fines not only interfere with drainage of the miscella from the solid residue and entail increased cost for separation therefrom, but also collect in and clog the hexane recovery condensers, reducing efficiency and necessitating more frequent cleansing."

four factors, and with appropriate preliminary steps or treatment, it becomes possible to recover oil efficiently and economically by solvent extraction of originally high oil content material. This is accomplished as the result of the ability to adhere to the practice of finally solvent extracting the material in flake form, rather than in fine granules, but without unreasonable production of fines or unusual or costly problems in the removal or recovery thereof."

The applicant then goes on to describe the process substantially as follows: First, the seed are subjected to pressure so as to reduce the oil content to 8 to 18% of the total weight, preferably within the range of 10 to 12%; second, the press cake is then broken into fragments sufficiently small to pass through a half inch screen; third, the comminuted fragments produced by step two are subjected to heat and moisture so as to bring the moisture to within a range of 10 to 12%, and to a temperature of from 145 to 200 degrees F.; fourth, the comminuted fragments after being treated with heat and moisture are introduced to "flaking rolls" which roll them out into thin flat flakes with "a thickness of .005 to .02 inch, but far beyond that in superficial area"; fifth, the flakes are then passed over a screen to remove dust or fine particles; sixth, the flakes are then conveyed to the extracting tower where they are subjected to the solvent; seventh, the oil is then separated from the solvent so that the latter can be used again. It is stated that: "The invention is simple, practical and economical, and enables high oil content material to be treated without over production of fines. Other advantages will be apparent to those skilled in the art."

Immediately after the foregoing statement the applicant proceeds to set out his "claims", which are eight in number; generally speaking, these claims are cumulative and somewhat variant descriptions of the process outlined above. It is noted that the applicant claims that his invention is "novel" in several respects, as follows: 1. The retention of residual oil in the meats after the initial pressing of the seeds, amounting to about one-fourth of the total protein content immediately after the pressing. 2. Comminuting the press cake into fragments of certain dimensions. 3. Treating the fragments with heat and moisture. 4. Rolling the fragments into thin flakes.

In their answer the defendants admit the jurisdictional allegations of the complaint and the status of the several defendants; they deny, however, that the individual defendants are necessary, indispensable, or proper parties to the action. It is further admitted that Dr. Dunning applied for the patent above described, admit that it was issued, and admit that it is now owned by the plaintiff. Defendants admit further that the plaintiff notified them that it claimed an infringement, admit further that the plaintiff has tried to get them to agree to a licensing arrangement and to pay royalties, and admit that they have refused to do so.

The defendants deny that John W. Dunning was the "true, original, first, and sole inventor" of the process in question, deny that the rules of the Patent Office were complied with in obtaining the patent, and deny that the patent is valid. Defendants further deny that they have infringed said patent, and by way of further answer they allege that while it is true that the two oil mill corporations have followed a practice of pre-pressing seed and then extracting residual oil from the cake by use of a chemical solvent, the plaintiff "by its own contemporaneous writing and advertisements, has repeatedly admitted and published to the industry that said method of extracting oil is old, wherefore plaintiff may not now charge the said method to be any infringement". Defendants further deny that the "invention" of Dr. Dunning has been of great utility and value, that it has been widely accepted, and that it has produced great economies and improvements in the industry; they likewise deny that

the plaintiff is entitled to the relief sought.

Following the foregoing averments, the defendants affirmatively allege that the applicant, with the knowledge and consent of the plaintiff, in the proceedings in the Patent Office so limited his claims that the plaintiff is now estopped to seek or obtain a construction of the patent sufficiently broad to cover any act or thing done by the defendants; that the patent is void because the subject matter thereof was covered by prior patents or described in printed publications in this and foreign countries; that the patent is invalid and void because the process covered thereby was known and used by others in this country prior to the alleged invention thereof by Dr. Dunning, and was in public use and on sale in this country more than one year prior to Dunning's application; that Dr. Dunning did not invent the process in question—that the Corn Processing Division of Clinton Foods, Inc., of Clinton, Iowa, had for many years used a prepress-solvent extraction method of extracting corn germ, and that this was widely known throughout the industry and to the plaintiff; further, that the Sessions Oil Mill at Enterprise, Alabama, had prepressed peanuts and other oil bearing seeds and nuts by such a process, and that this was known to the plaintiff by reason of visits to the Sessions plant by representatives of the plaintiff and by virtue of dealings between the plaintiff and the Sessions company; that there was a prior invention of the process before Dr. Dunning conceived it, specifically, that the French Oil Mill Machinery Company of Piqua, Ohio, had drawn up plans, descriptions, and operating instructions for a complete prepress-solvent extraction process and had sold the same to the Minnesota Linseed Oil Paint Company and to Archer-Daniels Midland Company, both of Minneapolis, Minnesota, and that both companies built such plants and operated them.

Defendants further affirmatively contend that the patent purports to encompass methods, processes, and conditions of operation which are incapable of producing any practical useful result, and "therefore include inoperative procedures devoid of utility, and procedures which cannot be applied, in conformity with the disclosures of said Letters Patent, to a large number of oil seeds or nuts of high oil content"; that the patent fails to describe or claim any differences over the prior art which were not obvious to a person having ordinary skill in the art; that the patent does not contain any inventive or patentable advance whatever over the prior art, or set forth any set or steps of operating conditions which are critical, or which differ from the prior art, except in degree; that it does not set out any novel steps or combinations of steps producing any new, unusual or different result, and that such differences as there are, if any, "constitute merely an aggregation of old and well known steps and operations".

Defendants further affirmatively contend that the applicant falsely represented to the Patent Office that his invention depended upon the control of residual oil content, temperature, moisture, flake size, and "oil-to-protein" ratio in prepressed cake, for which he "assumed to assign numerical values", whereas, in truth, all of these steps and elements, except the asserted oil-to-protein ratio, were old and well known in the conditioning of other oil bearing materials, such as soybeans. It is further alleged in this connection that plaintiff had in fact installed plants for the processing of soybeans which included all of the steps of the patented process, except the oil-to-protein ratio, and had published the information with respect to such steps; that it and the applicant concealed these facts from the Patent Office; and, further, that the applicant and plaintiff addressed language to the Examiner, calculated and intended to lead the latter to believe that the invention was limited and restricted to a process incorporating a "critical oil-to-protein ratio", but that the plaintiff as soon as

the patent was issued, asserted that its claims were not so limited.

It is finally alleged that in procuring the patent the applicant and plaintiff made use of an affidavit of Mr. N. Hunt Moore, the then manager of Delta Products Co., above referred to, which was highly commendatory of the process in question, and which referred to an article written by him, which article was likewise highly commendatory of said process; that Mr. Moore was represented as an independent and impartial expert, whereas, in truth and in fact, he was in privity with the plaintiff; that it was the duty of the applicant and plaintiff to explain and make clear their relationship to Mr. Moore, and that they wilfully failed to do so.

By way of counterclaim the defendants seek an adjudication of invalidity and noninfringement, an adjudication that the plaintiff is estopped from maintaining this action, and a judgment for damages, costs, attorneys' fees, and such other relief as they may be entitled to obtain. In their counterclaim they assert that early in 1950 the Old Corporation contemplated purchasing certain mechanical apparatus to be used along with the solvent extraction apparatus which was then in use by it so as to convert its straight solvent extraction process into a combined prepressing and solvent extraction process; that the plaintiff upon learning of the Old Corporation's plans advised the latter that it had patent rights on the combined process, and that if the Old Corporation should buy its additional equipment from the French Oil Mill Machinery Company, said Old Corporation would be confronted with an infringement suit; that in truth and in fact the plaintiff did not, early in 1950, "have any patent covering any such combined process, but merely an application pending in the United States Patent Office, which application was then under rejection".

It is further alleged that thereafter the Old Corporation purchased from the French Oil Mill Machinery Company certain apparatus and equipment, and did,

"without any aid or assistance from the plaintiff, and prior to the issuance of its said patent, proceed to recover oil from oil seeds by a combined prepressing and solvent extraction process"; that the Old Corporation continued so to do throughout the remainder of its corporate life, and that the New Corporation "has continued with such process since its acquisition of all the assets of the Old Corporation". It is further alleged that the defendants have repeatedly advised the plaintiff that they are not infringing the patent in suit, and have advised the plaintiff "that the oil contained in defendants' press cake, in relation to the protein content thereof, does not satisfy the ratio emphasized in said patent, of one part oil to four parts protein". It is then alleged that despite these statements made to the plaintiff, the latter has asserted that its "information is to the contrary", but that the plaintiff "has not tendered any evidence of its said information". Defendants allege further upon information and belief that "plaintiff was, at the time of filing its Complaint, without such evidence, wherefore defendants aver that this suit has not been brought in good faith".

In its reply to the counterclaim the plaintiff alleges that in 1950 it was advised that the Old Corporation was planning to convert its straight solvent extraction process to a "process, known as the 'Exsolex Process', embodying the invention forming the subject matter of an application for Letters Patent of the United States then pending and owned by plaintiff"; that thereafter its representative advised representatives of the Old Corporation of the pendency of said application, and of the plaintiff's intention "to deal with unlicensed users of the process, forming the subject matter of any Letters Patent * * * to be issued on said application, as infringers thereof"; that plaintiff offered a license to the Old Corporation to "practice the invention covered by any such Letters Patent"; that the Old Corporation refused such license, and that said

Old Corporation and the New Corporation without any license, and after surreptitiously gaining information relating to the "Exsolex Process" from a licensed user thereof, have practiced said process which is alleged to be protected by the patent in suit; that this amounts to an infringement and has been wilfull. The plaintiff moreover denies that any fraud or concealment was practiced in connection with the procuring of the patent, and it sets out in considerable detail its contentions with regard to the relationship between it and Mr. Moore and with respect to the purpose for which the Moore article was written. Said contentions will be referred to in some detail at a later point in this memorandum.

The interrogatories propounded to the plaintiff are thirty-three in number[3]; by means thereof the defendants seek in general to elicit from the plaintiff information relative to the basis for its asserted information and belief that its patent is being infringed, the good faith of the plaintiff, the knowledge of the plaintiff and of Dr. Dunning with respect to previous developments in the prepress-solvent extraction field, the dealings between the plaintiff and others in said field, and the circumstances under which the article by N. Hunt Moore was written. Defendants likewise seek, by means of certain interrogatories, to compel the plaintiff to produce for inspection and copying documents described in said interrogatories. The plaintiff has answered a number of the interrogatories without objection; with respect to others it has tendered objections but has also tendered answers; with respect to yet others it has refused to answer and has tendered objections thereto. It is the last class of interrogatories with which we are presently concerned. In general, the plaintiff's objections to the challenged interrogatories are that some of them are irrelevant, incompetent, and immaterial, that to answer certain others would cast an undue burden upon the plaintiff, and that to answer still others would compel the plaintiff to divulge to the public generally and to its competitors certain confidential information. It is further contended by the plaintiff that production of documents cannot be compelled by the use of interrogatories under Rule 33 of the Federal Rules of Civil Procedure, 28 U.S.C.A., and that to obtain such documents resort must be had to a motion under Rule 34 accompanied by a showing of "good cause".

In taking up the objections to the several challenged interrogatories it must be kept in mind that the Federal Rules of Civil Procedure are to be liberally construed, and that the scope of discovery under said Rules is broad. While an interrogatory must be relevant to the litigation, "the concept of relevancy is to be given a liberal interpretation", 4 Moore's Federal Practice, 2d Ed., p. 2296; the same author says:

"Since the court has the opportunity to go over interrogatories under Rule 33 in advance, it can exercise somewhat more supervisory authority than in the case of a deposition taken on oral examination, but the general principle remains the same; the test is relevancy to the subject matter of the action, not to the precise issues framed by the pleadings, and inquiry as to any matter which is or may become relevant to the subject of the action should be allowed, subject only to the objection of privilege and to the discretion of the court to limit discovery in particular situations. Interrogatories should not be disallowed for irrelevancy unless the inquiry is clearly outside the borders of the case. The admissibility of answers in evidence should be determined at the trial, and not at an earlier stage, and in any event ad-

---

3. The defendants originally propounded only 19 interrogatories, but subsequently 14 supplemental interrogatories were propounded; defendants, however, in propounding their supplemental interrogatories simply continued the numerical sequence of the original interrogatories.

missibility in evidence is not the test of the propriety of the interrogatory.

"The courts have generally given the idea of relevancy a broad scope. Thus interrogatories in a patent suit are not excluded merely because the relationship of matters inquired about is doubtful. * * *
* * * * * *

"The courts will not disallow an interrogatory on the ground that it relates to a claim or defense which is insufficient in law. * * * " Ibid., pp. 2296–2298.

▓▓▓ Interrogatories under Rule 33 are not limited to "material" or "ultimate" facts but "may extend to discovery of merely evidentiary or factual details, and the number and detailed character of interrogatories is not a reason for disallowing them, unless they are unduly burdensome or oppressive". Ibid., p. 2293. Where interrogatories require the investigation or compilation of data, it is ordinarily no ground of objection thereto that such investigation or compilation will be burdensome to the party to whom the interrogatories are propounded; this rule, however, is subject to the qualification that the court has the authority to make orders which will prevent oppression and hold down expense, and to weigh the annoyance and expense involved in compiling the data as against the value of the information sought to be obtained; the usual presumption, however, is in favor of "liberal discovery of relevant matters". Moore, op. cit., pp. 2314–2315. With reference to the plaintiff's objections that some of the defendants' interrogatories will require the disclosure of "confidential information", it may be said, generally speaking, that trade secrets are not privileged; while the Court has the power, under the provisions of Rule 30(b), to direct that such secrets need not be disclosed, nevertheless, "if the information is relevant and necessary to the presentation of the case, it will be required", and the court "may impose special conditions to protect the party". Ibid., page 1087.

With regard to the objection that production of documents cannot be compelled by means of interrogatories, defendants point out that their interrogatories recite that they are propounded under Rule 33 "and other relevant * * * Rules of Civil Procedure," and they ask us to treat the interrogatories calling for the production of documents as having been filed under Rule 34. While they concede that when the interrogatories were first propounded no showing of good cause for the production of documents was made or attempted, they have undertaken to supply this defect by an affidavit of Mr. Albert R. Henry of Buffalo, New York, one of their attorneys, who is a graduate of a technical college with majors in chemistry and chemical engineering, and who is a member of the American Chemical Society.

▓▓▓ We are satisfied that the plaintiff's position that production of documents cannot be compelled by means of interrogatories is, at least technically, well taken; 2 Barron & Holtzoff, "Federal Practice & Procedure," Section 770; 4 Moore, op. cit. p. 2322 et seq.; but we feel that the ends of justice will be best served in the instant case and that economy of time and effort will be effected by granting the defendants' request and treating collectively the interrogatories requesting the production of documents as a motion for that purpose filed under Rule 34. The question of whether or not good cause has been shown for the production of particular documents can, we think, be better passed upon in connection with specific interrogatories as we take them up.

▓▓▓ The first specific objection which we have occasion to consider is that which relates to those portions of Interrogatory No. 2 which call upon the plaintiff to "state the evidence upon which (it) will rely" to show: the residual oil in the defendants' press cake, the moisture content thereof; the temperature at which the press cake is

treated, tempered, or conditioned; the manner in which such press cake is broken up or "flaked"; the size or sizes of such broken or flaked cake; and the ratio of residual oil to protein in such press cake, prior to solvent extraction thereof.[4] Plaintiff's position with respect to said portions of this interrogatory is, in our opinion, well taken; while, as stated, it is no ground for objection to an interrogatory that it seeks to elicit information relative to evidentiary facts, as contrasted to ultimate facts, nevertheless it is improper to ask a party to state the evidence upon which he intends to rely to prove any particular fact or facts. 4 Moore, op.cit., page 2293; 2 Barron & Holtzoff, op.cit., Sec. 766; Cogdill v. Tennessee Valley Authority, D.C.Tenn., 7 F.R.D. 411, 415; McNamara v. Erschen, D.C.Del., 8 F. R.D. 427; Aktiebolaget Vargos v. Clark, D.C.D.C., 8 F.R.D. 635. Essentially the same question was before us in the recent case of Aetna Life Insurance Co. v. Little Rock Basket Co., D.C.Ark., 14 F. R.D. 383, 384, wherein we sustained an objection to an interrogatory which called upon the plaintiff to identify "all witnesses whose testimony will be introduced at the trial of this cause."

■ While we sustain the plaintiff's objection to those portions of Interrogatory No. 2 above referred to, we are of the opinion that the defendants have a right to propound an interrogatory for the purpose of ascertaining what the plaintiff knowns or believes concerning their operation, notwithstanding the fact that ordinarily they would be expected to know more about their own process than the plaintiff. In this connection Professor Moore says: "One purpose of interrogatories is to obtain admissions from the adverse party, and it is therefore no objection in the usual case that the information sought is within the knowledge of the interrogating party. Frequently, too, the contention that the information is within the party's knowledge is a sophism; the question is not so much what the facts are, but what the adverse party contends that they are." 4 Moore, op. cit., pp. 2293–2294. In the instant case it is obvious that the percentage of residual oil in the defendant's press cake, the moisture content and temperature thereof, and the other items above set forth may well have an important bearing on the issue of infringement, and we feel that the defendants are entitled to know what information the plaintiff has in connection with those matters; furthermore, the information desired may have some bearing on the defendants' contention that the suit was not brought in good faith. Leave will therefore be given to the defendants to re-propound this interrogatory in a form which is not subject to the objection that it calls for a statement of evidence "upon which plaintiff will rely."

■ Plaintiff next objects to Interrogatory No. 3 which inquires whether or not any of the information called for by Interrogatory No. 2 is "evidenced by any writing, drawing, report, chemical analysis, or specimen in plaintiff's possession", and which further requests, if plaintiff's answer be in the affirmative, that such data be produced for inspection and copying and that it be accompanied by a "statement showing the origin thereof and the time and manner by which it came into plaintiff's possession." In view of the fact that this interrogatory is so closely geared to Interrogatory No. 2, heretofore discussed, we think it well to sustain the plaintiff's objection to it in its present form. Leave will be granted to the defendants,

---

4. The first part of this Interrogatory called upon the plaintiff to state in detail "each and every element of 'information and belief' known to the plaintiff at the time of filing its Complaint herein, upon which the charge of infringement, * * * is predicated". The plaintiff answered this portion of the interrogatory by saying that the *ultimate* facts" (emphasis in answer) upon the basis of which the plaintiff made its allegation of infringement were that the respective defendants "had committed acts responding in full to every step of the process, or in the process, as set forth and claimed in the said Dunning patent in suit."

however, to propound an interrogatory inquiring whether or not the plaintiff now has in its possession any writing evidencing infringement, or any drawing of the defendants' machinery or plant, or any report, analysis, or specimen of the defendants' products or process, and, if so, to produce the same for inspection, photographing or copying. Assuming that such an interrogatory is propounded, and that the answer discloses the existence of such writings, drawings, reports, or specimens, we are of the opinion that good cause has been shown for their production. It is a reasonable supposition that if the plaintiff's information and belief that the defendants are infringing its patent are based, in whole or in part, upon such items, the plaintiffs will rely upon them at the trial, to some extent at least, to establish the alleged infringement; and we feel that the defendants are entitled to see them prior to the trial in order to make an intelligent preparation for an attempted showing either that such items are not correct representations, depictions, or samples of their operation, or, if correct representations, that they do not establish any infringement. Since such items, if they exist, are obviously within the exclusive possession and control of the plaintiff, the only means whereby the defendants can examine them is for the plaintiff to produce them. Moreover, we think that the defendants are entitled to a production of such items in connection with their claim that this action was not commenced in good faith.

Plaintiff next objects to the tenth interrogatory propounded by the defendants; before describing and discussing said interrogatory and the objection thereto, however, it is necessary to refer to Interrogatories No. 7 and No. 9. Interrogatory No. 7 inquired what articles were released to what publications giving data on the results of the operation of the plaintiff's process at Delta Products Company's mill at Wilson, Arkansas, and requested that said articles be listed by name of publication, title, pages on which the same appeared, date of publication, and apparent author. Plaintiff answered this interrogatory by stating that an article entitled "Exsolex Process In the Solvent Extraction of Cottonseed",[5] by N. Hunt Moore was published in the April, 1950 issue of the "Cotton Gin and Oil Mill Press"; that this article was published in a somewhat abbreviated form in the "Journal of the American Oil Chemists Society" for April, 1950, in "Chemical Engineering" for June, 1950, and in "Oil Mill Gazetteer" for July, 1950. Plaintiff further stated that as far as it knew N. Hunt Moore was the actual, as well as the ostensible author of the article. Interrogatory No. 9 called upon the plaintiff to identify by name, address, and position each person in the plaintiff's organization, or rendering service to it as advertising counsel, who, prior to April 1, 1950, had any knowledge of the plan to publish articles about the process, and further called upon the plaintiff to identify which of such persons had contributed in any manner to the preparation, editing, or revising of such articles; and, finally, which of them "discussed with, talked to, wrote to, or otherwise conferred or collaborated with N. Hunt Moore with respect to such 'stories'[6] prior to April 1, 1950." Plaintiff answered this interrogatory by stating that Mr. B. J. Veltman, plaintiff's sales manager, had knowledge of the fact that the company

---

5. "Exsolex Process" appears to be the trade name of the plaintiff's process.

6. In answering this and other interrogatories the plaintiff makes it clear that it denies that it published any "stories" about its process in the sense that the word "stories" carries an invidious implication. It does not appear to us that the defendants used the term in any invidious sense, but employed it because the plaintiff's sales manager had stated in a letter to the manager of the Morrilton Cotton Oil Mill at Morrilton, Arkansas, dated February 17, 1950, that the plaintiff would "release stories to the publications giving data on the results with Exsolex at the Wilson installation."

planned to publish spread advertisements in leading industry publications in April of 1950, and that it intended to release "stories" concerning the operation of the Exsolex Process at Wilson; that the president and vice president of the plaintiff also knew of this plan, as well as Dr. J. W. Dunning, the plaintiff's Director of Research, and Mr. W. D. Will, President of Will, Inc., the plaintiff's advertising counsel. By way of further answer the plaintiff stated that Dr. Dunning was asked by Mr. Moore to verify the correctness of certain factual statements in the Moore article, and that he did so "to the end that the article would be an entirely correct statement," which, according to the plaintiff, it was; and that Dr. Dunning was directed by the plaintiff to request that any facts then remaining confidential should not be improperly revealed in the article without the plaintiff's authority.[7]

This brings us to Interrogatory No. 10 which calls for the production for inspection and copying of "all preliminary drafts, revisions, notes, memoranda, interoffice correspondence, and correspondence originating with or received by plaintiff bearing upon or relating to the preparation and submission for publication of the articles or stories" above referred to. The plaintiff objects to this Interrogatory on the grounds that it calls for the production of documents and that there is no showing of good cause. In view of our opinion, heretofore expressed, that the interrogatories calling for the production of documents should be treated as a motion for the production of documents[8] filed under Rule 34, we consider only the question of good cause.

It is, as we understand it, one of the contentions of the defendants that the affidavit and article of N. Hunt Moore had a considerable bearing upon the decision of the Patent Office to issue a pat-

ent on Dr. Dunning's process, and that Mr. Moore was falsely represented as an impartial and unbiased expert whose opinion on the utility and value of the process in question was entitled to weight, whereas in truth and fact there was a close connection between Mr. Moore on the one hand and the plaintiff and Dr. Dunning on the other, and that the latter kept this connection concealed, thus, to some extent at least, imposing upon the Examiner. The plaintiff contends on the other hand that at the times at which the article was written and the affidavit executed there was no relationship between Mr. Moore and the plaintiff, and that there was no fraud, concealment or misrepresentation in connection with the obtaining of the patent; in this connection the plaintiff in its reply to the defendants' answer and counterclaim sets out in considerable detail that, at the times that the Moore article was written and the Moore affidavit was executed, Mr. Moore was general manager of Delta Products Company; that during a portion of the period between the publication of the article and the execution of the affidavit he was employed by the plaintiff as a consultant; but that he was not employed by the plaintiff as a consultant, or otherwise, either when the article was written or the affidavit made; that he was not entitled to compensation from plaintiff when he wrote said article or executed said affidavit, and that he had not been promised or induced to believe that he would be compensated; it is further contended that the article was written pursuant to the custom of the trade for the purpose of informing the public of the benefits to be obtained from use of the plaintiff's process and not for use in the Patent Office.

In his affidavit Mr. Henry states with respect to this Interrogatory that it calls for data entirely within plaintiff's control relating to the Moore article; he

---

7. At the time the article in question was published, the patent on the Exsolex process had been applied for but had not been issued.

8. The objection of the plaintiff that documents cannot be obtained by means of Interrogatories will not again be mentioned.

further states that the defendants have in their possession depositions taken in the Allis-Chalmers litigation to which we have referred; and he sets forth what we assume to be a correct copy of a portion of Mr. Moore's deposition in said litigation. From said portion of Moore's deposition it appears that he then deposed that the article in question had been written at the suggestion of the plaintiff, and he further stated that he had been paid for so doing. Mr. Henry also sets out a portion of Dr. Dunning's deposition in said litigation wherein Dr. Dunning testified that he was familiar with the article. Mr. Henry then goes on to say: "I therefore directed Interrogatory No. 10 to obtain, before trial or the taking of depositions * * *, documents relevant to the entire story, or, as I may be permitted to say, the 'behind the scenes' story, of how this article came to be written, and who, apart from Mr. Moore, made any contribution to it. The records so sought are material to the full presentation of this defense, and inspection is required to safeguard against surprise, and to refresh the memory of such witnesses as may be qualified to testify. I am moreover advised that Mr. Moore recently made a trip to New York City to discuss this topic with plaintiff's attorneys, and took with him all of his correspondence pertaining to the preparation of the article."

■■■■■ In view of the contentions of the parties and of the contents of Mr. Henry's affidavit, we feel that good cause has been shown for the production of the items called for by this interrogatory. The point is not whether the laudatory statements contained in Mr. Moore's article were true or false or proper or improper from an advertising standpoint, but whether or not there was a concealed relationship between Mr. Moore and the plaintiff of which the Examiner was ignorant, and whether or not the Moore article was "palmed off" on the Examiner as the spontaneous work of an impartial expert when in truth it was inspired, edited, and paid for by the plaintiff. If such an imposition was practiced on the Examiner it might have an effect on the validity of the patent,[9] and it certainly might have an effect on the measure of damages. It is clear that if such a relationship between the plaintiff and Mr. Moore as the defendants postulate existed, evidence thereof may well be found among the items sought by the defendants by means of this interrogatory, and it probably does not exist elsewhere. This we think is sufficient, and the plaintiff's objection to this interrogatory will be overruled.

■■■■■ By their Interrogatory No. 14 defendants inquired whether or not L. F. Langhurst, plaintiff's Chief Engineer, made a trip in 1947 outside of the United States for the purpose, among other things, of investigating an oil mill wherein oil bearing material was processed by a combined prepressing and solvent extraction procedure. Plaintiff objected to this interrogatory on the ground that it was incompetent, irrelevant, and immaterial, "and because it is confined to acts performed in a foreign country", but after stating its objection and reserving it answered the Interrogatory in the affirmative. The fifteenth interrogatory, which was to be answered only in the event that Interrogatory No. 14 was answered in the affirmative, as it was, called for the production of "all reports and memoranda reflecting the information obtained by

9. We are not to be understood as passing at this time upon the legal sufficiency of the defendants' contention that such an imposition, if proven, would invalidate the patent, or upon any other ultimate question in the case. In this connection we have already pointed out that it is no objection to an interrogatory that it relates to a defense or claim which is insufficient in law. It is not ordinarily the function of the court in passing upon objections to interrogatories to decide ultimate questions. See Love v. Metropolitan Life Insurance Co., D.C.Pa., 8 F.R. D. 583; Riordan v. Ferguson, D.C.N.Y., 2 F.R.D. 349; and Mall Tool Co. v. Sterling Varnish Co., D.C.Pa., 11 F.R.D. 576, 578.

the said L. F. Langhurst in connection with such trip." Plaintiff objects to this Interrogatory on the ground that the information sought is incompetent, irrelevant, and immaterial and treats of acts performed in a foreign country, and for the further reasons that no good cause has been shown for the production of the documents requested, and that to produce said documents would involve the disclosure of "confidential information which should not be made a matter of public record, or otherwise become accessible to plaintiff's competitor or competitors in business."

Both Interrogatory No. 14 and Interrogatory No. 15 obviously relate to the defendants' contention that Dr. Dunning was not the original inventor of the process for which he secured the patent in suit; from their briefs and from the affidavit of Mr. Henry it appears to be their theory that Mr. Langhurst in 1947 observed a prepress-solvent extraction process in operation in a foreign country, that he reported on his observations to his employer, and that his report was available in the plaintiff's files to Dr. Dunning, and that if the latter saw that report, it would have a material bearing on the novelty and originality of his invention. In one of their briefs the defendants say in this connection: "The materiality of the information so sought is this: A patentee must, to qualify for a patent, be the *original*, as well as the first inventor. The question is not what Mr. Langhurst saw in a foreign country. The question is what the plaintiff, in 1947, had in its files in the United States, and available to Mr. Dunning, and which would limit the scope of his originality or inventiveness." (Emphasis in brief.)

We cannot agree with the plaintiff that the information sought is immaterial on the ground that it relates to something which Mr. Langhurst saw in a foreign country. At the time the instant patent was applied for and at the time it was issued the effect of knowledge or use in a foreign country on the patentability in this country of a device or process was governed by 35 U.S.C.A. § 72, which was as follows: "Whenever it appears that a patentee, at the time of making his application for the patent, *believed himself to be the original and first inventor or discoverer of the thing patented,* the same shall not be held to be void on account of the invention or discovery, or any part thereof, having been known or used in a foreign country, before his invention or discovery thereof, if it had not been patented or described in a printed publication." (Emphasis supplied.) The relevant portions of the present Act, which became effective January 1, 1953,[10] are, insofar as pertinent here, as follows: "A person shall be entitled to a patent unless—(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or * * * (f) *he did not himself invent the subject matter sought to be patented* * * *." 35 U.S.C.A. § 102, subdivisions (a)(b) and (f), emphasis supplied. In our estimation knowledge by Dr. Dunning of what Mr. Langhurst saw in a foreign country, if anything, might have a material bearing upon the question of the originality of his invention under either of the two statutes above referred to. Assume in this connection that Mr. Langhurst ob-

10. Section 4 of Act of July 19, 1952, c. 950, 66 Stat. 815, provided that said Act should take effect on January 1, 1953 and should apply to all applications for patent filed on or after such date and to all patents granted on such applications, and that it should likewise apply to unexpired patents granted prior to such date except as otherwise provided. See Title 35 U.S.C.A., "Patents," note preceding section 1.

served while abroad a prepress-solvent extraction process in all material respects similar to the process later patented by Dr. Dunning, and assume further that he reported in detail on his observations and that Dr. Dunning studied his report; under such circumstances it might well be argued with respect to the former statute that Dunning could not have "believed himself to be the original and first inventor or discoverer of the thing patented," and it could likewise be argued with respect to the present statute that "he did not himself invent the subject matter sought to be patented." The language of the Supreme Court in Roemar v. Simon, 95 U.S. 214, 217–218, 24 L.Ed. 384, appears to be applicable to the question now under consideration; it was there said:

> "Exclusive rights of the kind are granted only to inventors or discoverers of some new and useful art, machine, manufacture, or composition of matter, or some new and useful improvement thereof; and the law is well settled that nothing short of invention or discovery will support a patent for any such alleged new and useful improvement.
>
> \*　\*　\*　\*　\*　\*
>
> "\*　\*　\* Proof of \*　\*　\* foreign manufacture and use, if known to the applicant for a patent, may be evidence tending to show that he is not the inventor of the alleged new improvement. \*　\*　\*"

And in Westinghouse Machine Co. v. General Electric Co., D.C.N.Y., 199 F. 907, the Court in discussing R.S. § 4923, which later became 35 U.S.C.A. § 72, above quoted, said:

> "Section 4923 does not exclude evidence of knowledge and use of the alleged invention in a foreign country on the application for a patent for that invention by one residing here and claiming to have in-

vented it here. Section 4923 does not say or intimate that if A., a resident of this country, applies for a patent here, claiming to be the original and first inventor of the invention for which he seeks a patent, it may not be shown that A. did not invent or discover it at all, but that he saw it in full practical operation and use in a foreign country, studied it, understood it, copied it, and brought his information to this country, and here sought to patent it as his own invention and discovery. I do not understand that a mere visitor to Europe, who there discovers or sees a new and useful machine in full operation (one not patented or described in a printed publication, and never heard of in the United States), may copy and make a duplicate here, and have a patent therefor as the original and first inventor, because of the provisions of section 4923, R.S. \*　\*　\*."
> 199 F. at page 917–918.

Further on in the same opinion the Court cited with approval a statement contained in the notes to 1 Robinson on Patents, Section 320, to the effect that "if a person claiming a patent derived his knowledge of the invention from such prior foreign use, his claim must be denied on the ground that it is not his own invention"; 199 F. at page 920, the Court said that the statement just quoted was "of course, true". Ibid.[11] See also 40 Am.Jur. "Patents", Section 33, and 69 C.J.S., Patents, § 26.

With respect to the necessary showing of good cause for the production of Mr. Langhurst's report, if any, we are satisfied that such has been made; Mr. Henry says in his affidavit that:

> "Prior to the preparation of the defendants' Answer and Interrogatories, I was advised on competent authority that the trip referred to in Interrogatory No. 14 had been

---

11. The issue before the Court in the Westinghouse case was different from the question presently before us since in that case it does not appear to have been contended that the American patentee had any personal knowledge of prior invention in a foreign country.

made by plaintiff's engineer, * * in connection with his investigation of a combined prepressing and solvent extraction process. His reports with respect thereto are peculiarly within the plaintiff's possession, and, to the best of my knowledge, can not be obtained in full elsewhere. The knowledge conveyed by Mr. Langhurst to plaintiff in 1947 has a direct bearing on the novelty, originality, and invention in the Dunning patent."

It seems obvious that at some stage of these proceedings Dr. Dunning and Mr. Langhurst will be called upon to testify, either in connection with the taking of discovery depositions or upon a plenary trial of the case, and the defendants will doubtless desire to interrogate them with respect to their knowledge of the foreign operation; this they cannot intelligently do unless they know the contents of the report which Mr. Langhurst made; moreover, they may need this report to refresh the memory of these, and possibly other witnesses.

█ Plaintiff's final objection to Interrogatory No. 15 is that it calls for the production of a document of a confidential nature. We likewise reject this contention. We have already pointed out that the fact that an interrogatory calls for the revelation of a "trade secret" is not of itself sufficient to make the interrogatory objectionable, and the same rule applies where a party seeks by motion under Rule 34 to compel the production of a document which may hold such a secret. In this connection in 4 Moore, op.cit., Sec. 34.15, pages 2468–2469, it is said: "There is no true privilege against discovery of trade secrets or other 'confidential' business information, but the courts nevertheless will exercise their discretion to avoid unnecessary disclosure of such information, particularly where the action is between competitors. Thus the court may forbid discovery entirely, or defer ruling until the trial, or appoint a mas-

ter to supervise discovery and control inspection of documents, or require simultaneous filing of sealed documents." Further on it is said: "Where material information is contained in documents which also contain information which the party seeking inspection should not see, the order will afford protection by requiring the inspection to be made in the presence of a representative of the party from whom the inspection is sought, or by having the examination supervised by an officer of the court or by a master. * * * Documents containing trade secrets and secret processes will be given special consideration so as to avoid revelation of information which should in fairness to the party be kept secret. * * * As provided by Rule 30(b), the court may defer or prohibit discovery where the interests of justice so require. But in determining a motion under Rule 34 and in framing its order, the court should be guided primarily by the spirit of the Federal Rules which requires that discovery before trial be made whenever possible." 4 Moore, op.cit., pp. 2477–2479.

█ In view of the apparent importance of the information sought, we are of the opinion that the defendants should be allowed to inspect, copy, or photograph Mr. Langhurst's report. Such inspection, copying, or photographing, however, should be conducted under such conditions as will protect the legitimate rights of the plaintiff and prevent unnecessary disclosure of its trade secrets to its competitors or to the public generally. We had a similar problem some years ago in the case of Lawrence Products Co. v. Monticello Charm Tred Mills, Inc.,[12] which was a suit between competitors involving an alleged theft of trade secrets, and while discovery was allowed, rather strict conditions were imposed. While we feel that plaintiff should be protected against unreasonable or unnecessary disclosure of its trade secrets and secret processes, and that conditions should be imposed

12. No written opinion was rendered in that case.

with respect to the inspection, copying or photographing of the Langhurst report, we do not undertake at this time to prescribe such conditions since we do not know the nature or contents of such report. It occurs to us that counsel may be able to agree upon proper conditions and precautions to be observed, but if they cannot do so, application may be made to the Court for an order prescribing such conditions and precautions, such order to be entered after notice and hearing, should the latter be necessary. What has just been said with reference to this particular objection of the plaintiff to Interrogatory No. 15 is equally applicable to the same objections which it makes with respect to other requests for the production of documents which it is contended contain trade secrets or other confidential information.

 Plaintiff's objections to Interrogatories No. 17 and No. 19 may be conveniently considered together. Interrogatory No. 17 requests the production of all reports, letters, or other memoranda from a Mr. A. P. Holly, the plaintiff's sales representative in Alabama during the years 1946–1948, both inclusive, relating to his visits to or transactions with the Sessions Oil Mill at Enterprise, Alabama. Interrogatory No. 19 requests the production of the original documents reflecting all commercial transactions between the plaintiff and the Sessions Mill during 1947, or a summary of such transactions showing the nature of each transaction. Plaintiff objects to these interrogatories on the ground that their subject matter is incompetent and irrelevant and immaterial, that the information sought is confidential, and that to supply it would be unduly burdensome. Again we disagree. The relevancy and materiality of dealings between the plaintiff and the Sessions mill seem clear from the defendants' allegations that said mill was operating a prepress-solvent extraction process prior to the application for the patent in suit, and that this was known to the plaintiff and was generally known in the industry; should these allegations be proved at the trial, the effect of such proof might be to invalidate the patent. See 35 U.S.C.A. § 31 (former statute); and 35 U.S.C.A. § 102(a) (present statute). As to the plaintiff's objection that the production of the data called for by these interrogatories would involve a disclosure of confidential information, what we have already said in that regard in connection with Interrogatory No. 15 is applicable to this particular objection to these two interrogatories. Nor do we feel that the production of these data will unduly burden the plaintiff; while Interrogatory No. 17 calls for data accumulated over a three year period, it only calls for the reports, letters, and memoranda of one man relative to one particular customer; in view of the scope of the dealings between plaintiff and the Sessions mill[13] it is reasonable to suppose that its files and records relating to that mill have been kept in a systematic order, and it should not unduly burden plaintiff's employees to find Mr. Holly's correspondence, reports, and memoranda. Likewise, while plaintiff contends in connection with Interrogatory No. 19 that its transactions with the Sessions mill have been on a very large scale, said Interrogatory is limited to one year only; moreover, the plaintiff may, if it wishes, submit a summary of such transactions in lieu of the individual original documents.

As heretofore indicated, Interrogatories No. 20 to No. 33, both inclusive, are supplemental to the 19 original interrogatories; generally speaking, these last fourteen interrogatories seek to elicit information from the plaintiff relative to its transactions involving sales or deliveries of equipment, apparatus, or machinery "useful" in the solvent ex-

13. In one of their briefs counsel for the plaintiff state that they have been informed that a summary of the transactions between plaintiff and Sessions would be "quite extensive and unduly burdensome" as the transactions run in size from a few dollars or less to hundreds or thousands of dollars.

traction of "oil bearing materials", services performed by its employees with respect to such equipment, apparatus, or machinery, the identity of employees furnishing such services, the nature of the material processed by such machinery, equipment, or apparatus, and the specifications or recommendations set or made by the plaintiff with respect to the operation of such machinery, equipment, or apparatus. Said interrogatories likewise seek to compel the plaintiff to produce certain documentary material. While the plaintiff has answered several of these interrogatories, it has objected to Interrogatories Nos. 23, 24, 28, 29, 30, 31, 32, and 33; it has also objected to Interrogatory No. 27 in the event that said interrogatory is given a broad construction to which it is apparently susceptible,[14] its objections are based upon several grounds, but principally it contends that said interrogatories are unlimited both with respect to time and subject matter, and that to comply with the defendants' requests would force it to go back over a twenty year period and report on probably thousands of transactions; in this connection it points out that there are untold numbers of items of machinery and equipment which are or may be "useful" for the solvent extraction of oil bearing materials, but that it does not follow that all of such items have been "used" in such extraction.

We feel that it would extend this memorandum to an undue length and would serve no useful purpose to discuss separately each of these challenged supplemental interrogatories. We agree with the plaintiff that these interrogatories, in their present form at least, are so broad and unlimited as to time and subject matter that to require the plaintiff to answer them would be unreasonable and unduly oppressive, and we sustain the objections thereto. Leave will be granted to the defendants to re-propound said interrogatories, however, in a narrower form, reasonably limited both with respect to time and subject matter. While, as stated, we feel that said interrogatories should be reasonably limited in the respects just mentioned, we do not at this time undertake to suggest or define specific limitations since we feel that such are matters which should be left to counsel in the first instance.

An order in accordance with the foregoing will be entered.

---

14. It appears that this Interrogatory may be subject to two constructions, one narrow, and the other extremely broad. Plaintiff did not object to said interrogatory, if narrowly construed, and has tendered an answer thereto under such construction.